# Illinois Official Reports

## Appellate Court

---

**People v. Balark, 2019 IL App (1st) 171626**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERIC BALARK, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-17-1626 |
| Filed | November 20, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-7930; the Hon. Joan Margaret O'Brien, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Joseph Michael Benak, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and David H. Iskowichm, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices Gordon and Burke concurred in the judgment and opinion. |

¶ 1        Following a bench trial, defendant Deric Balark was found guilty of unlawful use or possession of a weapon by a felon (UUWF). The trial court subsequently sentenced defendant to a term of six years in prison.

¶ 2        Defendant appeals, arguing that (1) his trial counsel was ineffective for failing to file a motion to quash arrest and suppress evidence because the police lacked probable cause to arrest defendant and (2) the State failed to prove defendant guilty of UUWF beyond a reasonable doubt.

¶ 3        In May 2016, defendant was indicted on two counts of UUWF, four counts of aggravated unlawful use of a weapon (AUUW), and one count of possession of cannabis. The State later dismissed the possession of cannabis charge. Defense counsel filed a motion to quash defendant's arrest and suppress evidence, arguing that defendant was arrested without a valid arrest warrant and his conduct prior to the arrest did not constitute probable cause that he had committed or was about to commit a crime. However, immediately prior to trial, counsel withdrew the motion and proceeded to a bench trial. The following evidence was presented at defendant's February 2017 bench trial.

¶ 4        Officer Leonidas Ferreras testified that in April 2016, he was assigned to the Fifth District tactical team with the Chicago Police Department. On April 23, 2016, at approximately 7 p.m., he was working with Officer Raske[1] and Officer Sharita Edwards. The officers were in plainclothes with vests and duty belts and driving an unmarked vehicle. Their duties were to patrol the area and attempt to suppress gang and narcotic violence. Officer Raske was driving with Officer Ferreras in the front passenger seat and Officer Edwards in the backseat. Officer Ferreras testified that the sun was still out and "artificial lighting was starting to turn on."

¶ 5        At approximately 7:10 p.m., Officer Ferreras observed a red minivan at the intersection of 107th Street and Michigan Avenue in Chicago when the minivan disobeyed a red light. The officers then curbed the vehicle at approximately 10519 South Michigan Avenue. He and the other officers exited the patrol vehicle. Officer Raske approached the driver's side of the minivan while Officer Ferreras approached the passenger side with Officer Edwards "slightly behind" him. As he approached the minivan, Officer Ferreras made the following observation:

> "I observed the gentleman to the right of me in the tan shirt with a white long-sleeve undershirt place what I believe to be a black semi-auto pistol with an extended magazine protruding from the magazine as well into the passenger side glove compartment."

¶ 6        Officer Ferreras identified defendant in court as the person he observed in the passenger seat of the minivan. He observed the firearm in defendant's hand and the extended magazine drew his attention. He estimated that he was approximately 5 to 10 feet away when he observed defendant place the weapon in the glove compartment.

¶ 7        Officer Ferreras testified that there were three other occupants in the minivan. He gave all occupants verbal directions to exit the vehicle, and they complied. As the occupants exited the vehicle, Officer Ferreras "noticed that the environment was getting very hostile." He observed members of the community coming out of their homes and gathering on the sidewalk. He stated

---

[1]The record does not disclose Officer Raske's first name.

that this occurred "very quickly" after the vehicle occupants exited the vehicle. He testified that his "main mission" was to watch the hands of the vehicle occupants as well as ensure the officers' safety and to conduct an investigation. The environment became "very tense" and "members of the community started becoming very hostile to us; yelling out profanities and very irate." Specifically, he described an older middle-aged black female who attempted to enter the area where the officers were conducting their interviews. Due to the situation, Officer Ferreras and his partners requested backup assistance and decided to continue the investigation at the Fifth District police station. While at the scene, a small bag of cannabis was found on another occupant of the minivan.

¶ 8    Officer Ferreras testified that he did not alert his partners about his observation of defendant with a weapon while on the scene. He explained that due to the hostile environment, he did not believe it was the "right or appropriate time" to converse with his officers about the weapon in the vehicle. He estimated that the assisting vehicles arrived on scene in no more than 5 to 10 minutes. All of the vehicle occupants were transported to the Fifth District. The red minivan was driven by Officer Edwards to the Fifth District. Officer Ferreras estimated that around 10 to 15 minutes had passed from when the vehicle was curbed to when the vehicle was being taken to the Fifth District.

¶ 9    Officer Ferreras did not alert Officer Edwards to the weapon when she entered the vehicle because of the hostile environment. He believed that the safety of the officers and the vehicle occupants was a priority. According to the officer, more people started coming out to the scene and asking what the officers were doing and why. From the time the officers arrived on the scene to when Officer Edwards entered the vehicle, Officer Ferreras did not observe anyone else enter the front passenger area of the vehicle.

¶ 10    Officer Ferreras rode to the Fifth District with Officer Raske. While driving to the Fifth District, Officer Ferreras notified Officer Raske about his observation of defendant placing a weapon in the glove compartment. He observed Officer Edwards park the vehicle at the police station. He then began a search of the vehicle with Officer Raske. Officer Ferreras searched the glove compartment and recovered "a black sub-compact Glock 26 Gen 4, nine millimeter with an extended magazine containing 12 live rounds." He also recovered a bag containing "a greenish/brown plant-like substance" that he believed to be cannabis. While at the police station, a custodial search of defendant was done by Officer Ferreras and Officer Raske. The officers recovered a little over $2700 in cash.

¶ 11    On cross-examination, Officer Ferreras testified that he believed he had his weapon drawn as he approached the minivan and it was "fair to say" his partners also had their weapons drawn. He could not recall the position of his firearm. Officer Ferreras drew his weapon based on his observations of the traffic violation and the vehicle traveling "at a fast rate of speed on Michigan Avenue." The officer clarified that the vehicle was not fleeing the police.

¶ 12    Officer Ferreras stated that he directed the vehicle occupants to put their hands in the air at the same time he observed defendant place the weapon in the glove compartment. When the occupants exited the vehicle, the officer conducted a protective pat down and began his interview. However, the officer was not able to perform his typical interview procedures due to the hostile environment.

¶ 13    When asked why the vehicle occupants were taken to the police station if he had not found anything, Officer Ferreras answered as follows:

"As I mentioned, I observed your client place a handgun onto [*sic*] the passenger side glove box. I later learned that the driver of the vehicle did not have a driver's license and he didn't have proof of the lease agreement. We also had another occupant in that vehicle who had a small portion of cannabis on his person, so the whole totality of everything; of all of the occupants and what we had and also the hostile environment that we were dealing with, we felt that it was more appropriate to continue this situation—continue this investigation at the 5th District."

¶ 14 Officer Ferreras did not have an evidence technician take a photograph of where the weapon was recovered because it was not standard protocol. He could not recall how many additional police vehicles arrived on the scene after assistance was requested. He did not inform the assisting officers about his observation of the weapon. He denied that the weapon was recovered three and a half hours after the traffic stop. Officer Ferreras estimated that the weapon was recovered about a half an hour after the traffic stop. He admitted that the weapon was not inventoried until 10:40 p.m. On redirect, Officer Ferreras clarified that the first thing he did was search the vehicle and recover the weapon. He then continued his duties and processed defendant and the other occupants. On re-cross, Officer Ferreras testified that he did not submit the weapon for fingerprinting because he and Officer Raske had handled it without gloves. According to the officer, gloves are used if available and he did not have gloves when searching the vehicle at the Fifth District.

¶ 15 Following the officer's testimony, the State presented a stipulation of defendant's certified statement of conviction for robbery on November 13, 2012. The State also presented a stipulation that an employee from the Illinois State Police searched the Firearm Services Bureau records on June 23, 2016, for defendant's name and date of birth. Her search indicated that defendant had never been issued a Firearm Owner's Identification (FOID) card or a concealed carry license (CCL) in Illinois. The State then rested. Defendant moved for a directed finding, which the trial court denied.

¶ 16 Defendant presented a stipulation from Officer Raske that if he were called to testify he would testify that he never observed a weapon on the scene. Defendant then testified on his own behalf.

¶ 17 On April 23, 2016, defendant was in a Chrysler minivan receiving a ride home from a friend of the family. The other two occupants were his cousins. He was picked up at 107th Street and Wabash Avenue. He had been in the vehicle for five minutes when they were pulled over for a traffic stop. He was in the passenger seat.

¶ 18 During the traffic stop, the three officers approached the vehicle. Officer Ferreras approached the passenger side with his gun drawn and pointing his gun toward defendant. Defendant denied having anything in his hands while in the vehicle or placing anything in the glove compartment. He also denied having a gun with an extended clip and opening the glove compartment. When Officer Ferreras came to the door, defendant had his hands up. He put his hands up "immediately as [the officer] approached the door." The officer then opened the door and pulled defendant out of the minivan. The other occupants were also pulled from the vehicle. He was asked if there was anything in the vehicle. Defendant testified that he told the officer he did not know because he had just been picked up.

¶ 19 Defendant and the other occupants were then handcuffed together at the back of the vehicle while all three officers searched the vehicle. Defendant testified that the female officer searched the back of the vehicle and watched them at the same time. He stated that the officers

searched the vehicle for 5 to 10 minutes until the other police vehicles arrived. According to defendant, he thought the officers found cannabis on one of the individuals, but that was the only item found. A weapon was not recovered during this search, and he never saw a weapon recovered. Defendant estimated that six or seven police vehicles arrived on the scene. He was then taken to the police station. Two hours later, a police officer asked defendant if he had a gun, and defendant told him that he did not know anything about a gun.

¶ 20      On cross-examination, defendant testified that he had $2700 in cash on him at the time. He had received the money from a girlfriend, and he was going to take his children shopping the next day. Defendant denied knowing there was cannabis in the glove compartment. The defense then rested its case.

¶ 21      In rebuttal, the State recalled Officer Ferreras. Officer Ferreras testified that he and Officer Raske gave *Miranda* warnings and spoke with defendant at the police station. See *Miranda v. Arizona*, 384 U.S. 436 (1966). They asked defendant about the recovered weapon and cannabis. Defendant acknowledged knowing about the cannabis but denied knowing about the weapon. The officer also asked defendant about the large amount of currency he had on his person and defendant responded that "he has a lot of girlfriends that give him money and that's how he acquired his money."

¶ 22      On cross-examination, Officer Ferreras testified that defendant was given his *Miranda* warnings around 11 p.m. The interview with Officer Raske occurred at that time. A separate interview with a detective occurred later, and Officer Ferreras was present for that interview, but the detective asked the questions. The officer did not show the weapon to defendant. Officer Ferreras clarified that defendant told the officers that he knew the cannabis was in the glove compartment but did not tell the officers that the cannabis belonged to him.

¶ 23      In surrebuttal, defendant reopened his defense and called Officer Edwards to testify. On April 23, 2016, she was on duty with Officer Ferreras and Officer Raske. The officers used the lights and the siren to curb a minivan. The minivan pulled over approximately 45 seconds to a minute after the lights and siren were activated. Officer Edwards was the rear passenger of the police vehicle and did not have access to use a "spotcam" on the minivan. Officer Edwards did not recall if she had her weapon drawn when she exited the vehicle nor could she recall if Officer Raske or Officer Ferreras had their weapons drawn. Officer Raske approached on the driver's side. She approached the passenger side of the minivan behind Officer Ferreras. She estimated that she was approximately five feet behind him. She did not observe any of the occupants of the van do anything, nor could she see if their hands were in the air. She explained that she was further back from Officer Ferreras and the rear windows were tinted. Officer Ferreras was closer to the vehicle than she was. She was not close enough to see whether the occupants in the vehicle were moving. Officer Ferreras gave verbal commands for the occupants to raise their hands, but she was not close enough to see if they complied. She did not observe anyone in the vehicle open the glove compartment. The occupants were then ordered to exit the vehicle and placed to the rear of the vehicle. She did not know if they were handcuffed together, but she knew at some point they were handcuffed. She did not know how much time passed until more officers arrived at the scene.

¶ 24      The vehicle occupants were placed in vehicles belonging to the assisting officers. Officer Edwards did not search the vehicle. She denied that Officer Raske and Officer Ferreras searched the vehicle at the scene. Officer Raske and Officer Ferreras searched the vehicle in the station parking lot after Officer Edwards drove the vehicle to the station, but she was not

present for the search. She went into the police station to take possession of the vehicle occupants. She was later informed that Officer Ferreras had recovered a weapon and illegal drugs.

¶ 25 On cross-examination, Officer Edwards described what happened at the scene:

"Well, there were citizens coming out into the street and a few individuals in particular were approaching as we were conducting the investigation at that point. We were asking them to step back which they weren't following our verbal directions to, you know, remain back."

¶ 26 Officer Edwards identified defendant in court as the front passenger of the vehicle. She testified that people at the scene were yelling and screaming profanities at the officers. She estimated there were at least 10 people at the scene. On redirect, Officer Edwards admitted that Officer Ferreras did not notify her about a weapon being in the glove compartment. At the station, she gave the keys to Officer Raske and Officer Ferreras and went inside the station. She did not "stand there and watch" their search of the vehicle. She did not view the weapon recovered. Defendant then rested.

¶ 27 Following arguments, the trial court found defendant guilty of all counts. The court made the following findings on the record.

"After considering the testimony that I heard from all of the witnesses as well as the evidence that came in through—by way of stipulations and any arguments of the attorneys, looking at the credibility of the witnesses, one of these things that Mr. Balark testified to I find inconceivable. He said that the female searched the back referring to the police officer and watched us at the same time. To have one female officer doing double duty of searching the back of a mini-van and watching four individuals seems inconceivable to me.

What does not seem inconceivable is that Officer Ferreras let his partner take the van without telling her about the gun being in it. It's not like they took some unknown person off the street and said here, drive this van when you don't know if the person had an FOID Card or a Concealed Carry. This was a Chicago Police Officer that drove the van back to the station, so then the argument is that there is reasonable doubt all stemming from that because Officer Ferreras didn't yell gun when he saw the gun with the extended clip in the Defendant's hand and as I said earlier even though that is unusual, there are circumstances that explain the snap decision that he has to make that day that was going to protect not only himself and his fellow officers, but also the Defendant, the occupants of the car, and all of those individuals on the street and the extended clip has the capacity to hurt a lot of people. He made a decision that he thought was best for everyone and that does not create reasonable doubt in my opinion. I find both officers testified credibly."

¶ 28 In March 2017, defendant filed a motion for a new trial, which the trial court denied. At the sentencing hearing, the trial court sentenced defendant to a term of six years in the Department of Corrections. Counts II through VI merged into the count of UUWF.

¶ 29 This appeal follows.

¶ 30 Defendant first argues on appeal that his trial counsel was ineffective for failing to file a motion to quash his arrest and suppress evidence. We note that defense counsel did file a motion to quash arrest and suppress evidence but withdrew the motion without a hearing.

According to defendant, had trial counsel not withdrawn the motion, then the motion would have resulted in the suppression of defendant's criminal history. Specifically, defendant contends that he was arrested without probable cause and, at the time of his arrest, the police had no knowledge of defendant's status as a felon and that it was unlawful for him to possess a weapon. The State maintains that trial counsel was not ineffective because the decision to withdraw the motion was strategic and was not prejudicial because there was sufficient probable cause to support defendant's arrest.

¶ 31 Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001).

¶ 32 "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "In recognition of the variety of factors that go into any determination of trial strategy, courts have held that such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *Id.* at 330-31 (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), and *Strickland*, 466 U.S. at 689).

¶ 33 In evaluating prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697.

¶ 34 Defendant contends that his trial counsel was ineffective for failing to file a motion to quash arrest and suppress evidence. Specifically, defendant asserts that he was arrested without probable cause based on his possession of the firearm because the police had no basis to know his possession was unlawful at the time of the arrest. He maintains that his trial counsel's decision to withdraw the motion to quash arrest and suppress evidence lacked trial strategy and prejudiced him. In order to prove ineffective assistance of counsel, defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Giles*, 209 Ill. App. 3d 265, 269 (1991). A decision that involves a matter of trial strategy will typically not support a claim of ineffective representation. *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003). The question of whether to file a motion to suppress evidence is traditionally considered a matter of trial strategy. *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000). "[I]n order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 35 "Both the fourth amendment and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31 (citing U.S. Const., amend. IV, and Ill. Const. 1970, art. I, § 6). "This court has explained that '[t]he "essential purpose" of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions.' " *Id.* (quoting *People v. McDonough*, 239 Ill. 2d 260, 266 (2010), quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

¶ 36 "It is well settled that not every encounter between the police and a private citizen results in a seizure." *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006) (citing *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 215 (1984)). "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Id.* (citing *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982), and *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982)).

¶ 37 "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008). "That is, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest." *Id.* at 564. " ' "The standard for determining whether probable cause is present is probability of criminal activity, rather than proof beyond a reasonable doubt. [Citations.]" ' " *Id.* (quoting *People v. Garvin*, 219 Ill. 2d 104, 115 (2006), quoting *People v. Lee*, 214 Ill. 2d 476, 485 (2005)). Further, "probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false." *Id.*

¶ 38 The State maintains that the police had probable cause to arrest defendant, and thus, the motion to quash would not have been meritorious. The arrest report from April 24, 2016, stated that the officers observed a red Chrysler minivan "disregard a solid red light and proceed north bound on Michigan Ave from 105th Street at a high rate of speed." The vehicle was then curbed. When approaching the vehicle, Officer Ferreras observed defendant in the front passenger seat place a "black semi-auto pistol with an extended magazine protruding from the magazine," which Officer Ferreras believed to be a weapon, in the glove compartment. According to the State, these facts would lead a reasonable person to believe that defendant was committing the offense of unlawful use of a weapon.

¶ 39 Defendant argues that following the Illinois Supreme Court's September 2013 decision in *People v. Aguilar*, 2013 IL 112116, his conduct could not have given rise to probable cause because the police observing a person in possession of a handgun is no longer sufficient probable cause without other evidence of a crime. In *Aguilar*, the supreme court considered the constitutionality of a prior version of the AUUW statute, which "categorically prohibit[ed] the possession and use of an operable firearm for self-defense outside the home." *Id.* ¶ 21. The *Aguilar* court specifically noted that the subsequently amended version of the AUUW statute was not at issue in the case. *Id.* ¶ 22 n.4.

¶ 40 Significantly, also in 2013, the Illinois General Assembly enacted the Firearm Concealed Carry Act (the Act) (codified at 430 ILCS 66/1 *et seq.* (West 2014)), which, in part, "amended

the AUUW statute to allow for a limited right to carry certain firearms in public. See Pub. Act 98-0063 (eff. July 9, 2013)." *Aguilar*, 2013 IL 112116, ¶ 22 n.4. Defendant's offenses were committed after the relevant statutes had been amended and the Act had been enacted. Thus, our focus on appeal is not on *Aguilar*, but on the laws in effect at the time of his arrest.

¶ 41    We find the Illinois Supreme Court's decision in *People v. Colyar*, 2013 IL 111835, to be relevant to our analysis. While *Colyar* was decided a few months prior to *Aguilar*, we note that the petition for rehearing in *Colyar* was denied after the *Aguilar* opinion had been issued. See *id.* (rehearing denied Oct. 3, 2013); *Aguilar*, 2013 IL 112116 (filed on September 12, 2013). In *Colyar*, the supreme court considered whether the defendant's fourth amendment right to be free from unreasonable searches and seizures had been violated by police during a proper *Terry* stop. *Colyar*, 2013 IL 111835, ¶ 1.

¶ 42    In the trial court, the defendant filed a motion to quash arrest and suppress evidence. *Id.* ¶ 4. At the hearing, one of the arresting officers testified that he and his partner arrived at a motel at about 8:45 p.m. to check for " 'parties and stuff of that nature' " involving minors. *Id.* ¶ 6. The officers had not received reports of criminal or suspicious activity that day. *Id.* When they arrived at the motel, defendant's vehicle was parked in the south entrance to the motel's parking lot, between 50 and 100 feet from the main building entrance. *Id.*

¶ 43    The officers parked and exited their vehicle and walked toward defendant's vehicle to ask him why he was parked in the entrance. *Id.* ¶ 7. They did not draw their weapons. *Id.* The defendant was sitting in the driver's seat with the engine running, and there was a passenger in the vehicle. *Id.* As the officers walked to defendant's vehicle, a third person exited the motel and entered the rear passenger side of the vehicle. *Id.*

¶ 44    When the officer asked the defendant why he was blocking the entrance, the defendant replied that he was picking someone up from the motel. *Id.* ¶ 8. The officer shined his flashlight into the center console and saw in plain view a plastic bag with a bullet " 'sticking up' " inside. *Id.* The officer then ordered defendant and his two passengers out of the vehicle and handcuffed them. *Id.* ¶ 9. The officer recovered a plastic bag from the center console containing five live rounds of .454-caliber ammunition. *Id.*

¶ 45    The officers then patted down the defendant and recovered a bullet from his front pants pocket matching the five .454-caliber bullets. *Id.* ¶ 10. Based on the recovery of the five bullets from the center console and the single bullet from the defendant's pocket, the officer believed that a gun might be inside defendant's vehicle. *Id.* The officer's partner subsequently found a .454-caliber revolver under the floor mat on the front passenger side. *Id.*

¶ 46    Following the hearing, the trial court granted the defendant's motion to suppress and the appellate court affirmed, holding that the police subjected defendant to an unlawful search without probable cause because the bullet did not establish evidence of a crime. *Id.* ¶ 2.

¶ 47    On appeal, the supreme court observed that the defendant conceded that his initial encounter with the officers was proper under *Terry*. *Id.* ¶ 41. The State contended that based on the totality of the circumstances, the neutral encounter escalated when the officer observed the bullet in plain view on the center console of the defendant's vehicle. The officers then had a reasonable suspicion that the defendant or a passenger were armed and dangerous and that criminal activity was afoot to warrant detaining the individuals and performing a protective search of their persons and the areas of the car that were immediately accessible for a weapon. *Id.* ¶ 28. The defendant argued that the officers' conduct was not justified under *Terry* because the circumstances were " 'absolutely benign' and possession of a bullet is not *per se* illegal."

*Id.* ¶ 29. The *Colyar* court recognized that "roadside encounters are 'especially hazardous,' and a police officer may reasonably believe that he is in danger from the possible presence of accessible weapons inside the vehicle." *Id.* ¶ 38 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)).

¶ 48   In holding that the defendant's fourth amendment rights were not violated, the supreme court found that the police officers, having seen a bullet inside the vehicle in plain view, could reasonably suspect that their safety was in danger and could reasonably order the passengers out of the vehicle and search them for weapons. *Id.* ¶¶ 42-45. The *Colyar* court further found that handcuffing the defendant and the other occupants was reasonable because the police officers were outnumbered, it was dusk, and the police could reasonably suspect that some of the vehicle occupants possessed a gun or would be able to access a gun inside the vehicle if they were not secured by handcuffs. *Id.* ¶ 47.

¶ 49   Similar to *Colyar*, we consider whether defendant's conduct in possessing a firearm gave rise to probable cause that a crime was being committed. As discussed, the State asserts that a reasonably cautious person would believe that a crime was being committed, unlawful use of a weapon.

¶ 50   A person commits unlawful use of a weapon when he knowingly "[c]arries or possesses in any vehicle" any pistol, but this offense does not apply to or affect transportation of weapons that meet one of the following conditions, if the weapon is: (1) broken down in a non-functioning state, (2) not immediately accessible, (3) unloaded or enclosed in a case, or (4) "[c]arried or possessed in accordance with the Firearm Concealed Carry Act by a person who has been issued a currently valid license under the Firearm Concealed Carry Act." 720 ILCS 5/24-1(a)(4) (West 2016).

¶ 51   Here, based on the evidence presented at trial, the only potential exception is if the firearm was in possession in accordance with the Act. The Act defines " '[c]oncealed firearm' " as "a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public or on or about a person within a vehicle." 430 ILCS 66/5 (West 2016). Under the Act, a CCL shall permit the licensee to "(1) carry a loaded or unloaded concealed firearm, fully concealed or partially concealed, on or about his or her person; and (2) keep or carry a loaded or unloaded *concealed* firearm on or about his or her person within a vehicle." (Emphasis added.) *Id.* § 10(c). Under the Act, if an officer initiates an investigative stop, upon the request of the officer, a licensee shall disclose to the officer that he or she is in possession of a *concealed* firearm under the Act or present his or her license to the officer and, upon request, identify the location of the concealed firearm. *Id.* § 10(h). Further, during a traffic stop, any passenger within the vehicle who is a licensee must comply with the disclosure requirements. *Id.*

¶ 52   This court directed the parties to file supplemental briefs to address the issue of probable cause for unlawful use of a weapon and the statutory language of "on or about a person within a vehicle" as used for a concealed firearm under the Act. That issue is the crux of defendant's argument on appeal. It is undisputed that defendant did not possess a valid CCL, but he maintains that his conduct as viewed by Officer Ferreras did not suggest a crime was being committed. For purposes of our analysis only, we will presume that defendant had a valid CCL and address whether his conduct would be permitted under the language of the Act. For the reasons that follow, we conclude that defendant's conduct was not in accordance with the Act.

¶ 53    "The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent." *People v. Comage*, 241 Ill. 2d 139, 144 (2011). "The legislature's intent is best indicated by giving the statutory language its plain and ordinary meaning." *Id.* "A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous." *People v. Clark*, 2019 IL 122891, ¶ 20. "The court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Id.* Further, a court presumes that the legislature did not intend absurdity, inconvenience, or injustice in enacting legislation. *Id.* "Legislative intent is ascertained by considering 'the entire Act, its nature, its object and the consequences' of 'construing it one way or the other.' " *Quinn v. Board of Education of the City of Chicago*, 2018 IL App (1st) 170834, ¶ 69 (quoting *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 96 (1990)). "While a statute's title cannot be used to limit the plain meaning of statutory text, it can provide guidance in resolving statutory ambiguities." *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 40. Additionally, "[w]hen discerning legislative intent, it is also proper to compare statutes relating to the same subject matter as well as statutes 'upon related subjects though not strictly *in pari materia*' because 'statutes are to be read in the light of attendant conditions and the state of the law existent at the time of their enactment.' " *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 470 (2010) (quoting *People v. Boreman*, 401 Ill. 566, 571-72 (1948)).

¶ 54    In considering the unlawful use of a weapon statute as a whole, we review the other exceptions and the intention of the legislature. These exceptions, *i.e.*, (1) broken down in a nonfunctioning state; (2) not immediately accessible; or (3) unloaded and enclosed in a case, firearm carrying box, shipping box, or other container by a person with a valid FOID card (720 ILCS 5/24-1(a)(4) (West 2016)) indicate that the legislature sought to limit the possession of loaded and readily accessible firearms in vehicles. There is a clear public safety purpose in preventing individuals from carrying or possessing loaded and accessible firearms in a vehicle to deter criminal activity and keep the public safe.

¶ 55    The exception before us, carried or possessed in accordance with the Act, does not change our position. Under the Act, the licensee is permitted to "keep or carry a loaded or unloaded concealed firearm on or about his or her person within a vehicle." 430 ILCS 66/10(c)(2) (West 2016). Thus, the question is whether defendant's conduct fell within this permitted possession under the Act.

¶ 56    Defendant argues in his supplemental brief that the firearm was a "concealed firearm" both before and after the firearm was placed by defendant in the glove compartment. According to defendant, a firearm is considered a "concealed firearm" under the Act in a vehicle even when visible to the public. Defendant asserts that the definition of "concealed firearm" under the Act does not require that the firearm actually be concealed when in a vehicle.

¶ 57    The State notes that this interpretation creates, in essence, an open carry law while in vehicles. As the State observes, under defendant's interpretation, placing a firearm on the dashboard while driving, driving with one hand on the steering wheel and the other hand on a firearm, or as in the present case, having a visible firearm on a passenger's lap or in his or her hand would be in compliance with the Act. The State further points out that defendant's position does not comport with other provisions of the Act, such as, section 10(h), where the

- 11 -

licensee must "identify the location of the concealed firearm" when asked. *Id.* § 10(h); see also *People v. McMichaels*, 2019 IL App (1st) 163053. We agree with the State.

¶ 58　　Illinois does not allow for open carry of firearms. We cannot agree with an interpretation of the Act in which an individual's conduct in a vehicle would equate with open carry. The name of the Act is the "Firearm Concealed Carry Act." 430 ILCS 66/1 (West 2016). The term "concealed" cannot be read out of the Act where the term is, in essence, the entire purpose of the Act. The Act allows for a licensee to possess a *concealed* firearm on or about his or her person within a vehicle. As the State points out, the use of the term "concealed" to modify firearm indicates the legislative intent for firearms in a vehicle to remain concealed as well as on or about the person within a vehicle. See *id.* § 10(c)(2). If the legislature did not intend for concealment of firearms, then it could have omitted the word from the statutory language. Moreover, under defendant's view, the term "concealed" is superfluous. When viewing the Act as a whole, we reject an interpretation that renders the term "concealed" superfluous. Each word of a statute must be given a reasonable meaning and avoid any interpretation that renders a word superfluous. *Clark*, 2019 IL 122891, ¶ 20.

¶ 59　　As previously stated, section 10(c) of the Act specifically provides what a license permits an individual to do under the Act. According to defendant, the use of the phrase "concealed firearm" in that section relates back to the definition. We disagree. The Act defines " '[c]oncealed firearm' " as "a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view of the public or on or about a person within a vehicle." 430 ILCS 66/5 (West 2016). Our interpretation is supported when section 10(c) is read together with section 10(h), which governs a licensee's required responses during an investigative stop with law enforcement. That section requires the licensee to disclose his or her status as a CCL holder when asked by law enforcement. *Id.* § 10(h). Further, the statute requires the licensee to "identify the location of the concealed firearm and permit the officer to safely secure the firearm for the duration of the investigative stop." *Id.* This language illustrates that the legislature envisioned that that a firearm in the vehicle of a licensee would be concealed. Under defendant's interpretation, this provision would be unnecessary.

¶ 60　　In his supplemental brief, defendant cites several cases to support his argument that his possession of a firearm was proper under the Act. However, we find these cases do not support defendant's position on appeal since we are considering whether the officer had probable cause. All of the cases relied on by defendant were challenging whether the evidence of "on or about" the person was sufficient to prove a defendant guilty beyond a reasonable doubt. See *People v. Wise*, 2019 IL App (3d) 170252; *People v. Liss*, 406 Ill. 419 (1950); *People v. Niemoth*, 322 Ill. 51 (1926); *People v. Foster*, 32 Ill. App. 2d 462 (1961); *People v. Cosby*, 118 Ill. App. 2d 169 (1969); and *People v. Woodworth*, 187 Ill. App. 3d 44 (1989). None of the cases considered the question under the lower standard of probable cause for arrest. In this case, we are considering whether Officer Ferreras had probable cause to arrest defendant. The standard is whether a reasonably cautious person could have believed that the defendant had committed a crime, not whether the State had proven all elements of an offense beyond a reasonable doubt. Somewhat ironically, some of these cited cases actually lend support to our analysis. Specifically, several of these cases considered whether a defendant was guilty of carrying a concealed firearm on or about his person and discussed these required elements. These cases illustrate the consistent interpretation of what constitutes a concealed firearm under Illinois case law for nearly a century.

¶ 61 In *Niemoth*, 322 Ill. 51 (1926), the defendant was found guilty of carrying a concealed firearm on or about his person and argued on appeal that evidence failed to prove him guilty beyond a reasonable doubt. There, the relevant statute provided: " 'No person shall carry concealed on or about his person a pistol, revolver or other fire-arm.' " *Id.* at 52 (quoting Ill. Rev. Stat. 1925, ch. 38, § 155). The supreme court observed that, "Before there can be a conviction under the statute prohibiting the carrying of fire-arms concealed on or about the person there must be proof that the fire-arm is carried in such a manner as to give *no* notice of its presence and in such proximity of the accused as to be within his easy reach and under his control." (Emphasis added.) *Id.* at 53. In that case, two firearms were found lying on the floor of the car behind the front seat. The court held that the evidence did not show whether the firearms were in position where the defendant could have reached them without changing his position, whether the defendant knew the firearms were present, or whether the firearms belonged to him. *Id.* "The pernicious practice which the legislature intended by this statute to interdict was the carrying concealed of a gun of a size capable of being concealed on or about the person, in a place so accessible as to allow its immediate use as a deadly weapon when wanted." *Id.*

¶ 62 Similarly, in *Liss*, 406 Ill. 419 (1950), the supreme court again considered the same statutory language from the defendant's appeal of his conviction. There, a firearm was found underneath a car's seat, approximately six inches back in a space three inches wide. The car was occupied by the defendant and a passenger. *Id.* at 420-21. In reversing the defendant's conviction, the *Liss* court built on the holding of *Niemoth* and held that under a reasonable construction of the statute, "there must be concealment of the weapon, and it must be on or about the person; and it must be so placed that it may be used without appreciable change in the position of the owner." *Id.* at 424. The court concluded that the firearm was not accessible to the defendant because he would have to change his position. *Id.*

¶ 63 Later, the Fourth District in *Foster*, 32 Ill. App. 2d at 467, found that a firearm found inside an "athletic type" zippered bag next to the defendant was concealed on or about the person, in violation of the same statute. The reviewing court detailed the required elements as follows:

> "Breaking down the elements necessary to show a violation of the statute we find that under the Illinois rule there are two. First, the weapon must be concealed. There can be little question that if the gun was in the zipper bag, it was concealed. The second requirement is that the weapon must be on or about the person. To be on or about the person two conditions must be met. First, the weapon must be located either on the person or in such close proximity that it can be reached without a material or appreciable change in his position. Second, once the defendant reaches to where the weapon is located, the weapon must be readily accessible." *Id.*

¶ 64 These cases demonstrate that a required element was concealment, *i.e.*, hidden from view with "no notice of its presence." *Niemoth*, 322 Ill. at 53.

> "It is a well-established principle of statutory construction that 'where terms used in [a] statute have acquired a settled meaning through judicial construction and are retained in subsequent amendments or re-enactments of the statute, they are to be understood and interpreted in the same sense theretofore attributed to them by the court unless a contrary intention of the legislature is made clear.' " *In re Marriage of O'Neill*, 138 Ill. 2d 487, 495 (1990) (quoting *People ex rel. Nelson v. Wiersema State Bank*, 361 Ill. 75, 78-79 (1935)).

"This rule is based upon the view that 'the judicial construction [of a statute] becomes a part of the law, and it is presumed that the legislature in passing the law knew [of] such construction of the words in the prior enactment.' " *Id.* at 496 (quoting *Wiersema State Bank*, 361 Ill. at 79). While the Act was new legislation and not an amendment to an existing enactment, we believe this rule is equally applicable here where the judicial construction of a "concealed firearm" in the criminal statutes has a longstanding interpretation. Since we presume the legislature was aware of this construction of the terms "concealed" and "on or about the person" within a vehicle, we reject defendant's reliance on these decisions here.

¶ 65    We further find defendant's reliance on the governor's amendatory veto to be misplaced. Governor Pat Quinn offered an amendatory veto of the pending version of the Act. In his statement, Governor Quinn offered thoughts on multiple parts of the bill and specifically addressed his concerns with the definition of concealed and stated:

> "The definition provided for 'concealed firearm' is insufficient and must be clarified to ensure that when guns are carried, they are completely concealed from public view.
>
> As written, the definition includes the phrase 'mostly concealed,' which would allow a licensee to walk around in public with a portion of his or her gun exposed.
>
> Make no mistake—this is a step towards open carry in Illinois. This vague definition can lead to fear and confusion among the public, varying interpretations and enforcement, and the potential for subsequent litigation.
>
> If Illinois is going to legalize the carrying of loaded, concealed guns, the legislation must be clarified to ensure when guns are carried, they are completely concealed." Letter from Pat Quinn, Governor, to the Members of the Illinois House of Representatives, 98th General Assembly (July 2, 2013), http://www.ilga.gov/ legislation/98/HB/PDF/09800HB0183gms.pdf [https://perma.cc/7ZC5-G4FB].

¶ 66    Governor Quinn included in his multiple amendments to the bill the following definition for a concealed firearm under the Act, "a loaded or unloaded handgun carried on or about a person completely covered or not visible from the view of the public, or carried in a vehicle concealed, covered, or not visible from the view of the public." *Id.* Both houses of the General Assembly overrode the Governor's amendatory veto. I Final Legislative Synopsis and Digest of the 98th Ill. Gen. Assem. (No. 17), at 1961, 1966.

¶ 67    When we read Governor Quinn's reasoning along with his proposed amendment, it is clear that his concern was the phrase "mostly concealed" when firearms were carried in public. His amendment wanted all firearms completely concealed at all times. The legislature overrode his veto. However, this does not suggest that the legislature intended for an individual to carry a visible firearm in a vehicle, and we decline to infer such a broad intention. Moreover, the legislature did not need to add this language to the phrase "concealed on or about the person" in a vehicle because of the long settled meaning the courts have given to this same language. Accordingly, we conclude that possessing a firearm in one's hand while in a vehicle is not in compliance with possession on or about a person within a vehicle under the Act.

¶ 68    Turning back to the present case, we find that based on the totality of the circumstances at the time of the arrest, a reasonably cautious person could have believed that the defendant had committed a crime, unlawful use of a weapon. Similar to the circumstances in *Colyar*, the officers initiated a legal stop, in this case for a traffic violation. Officer Ferreras initially

observed the vehicle disregard a red light at a high rate of speed. As the officer approached the curbed vehicle, he observed defendant in possession of a firearm with an extended clip, which defendant placed into the glove compartment. When the occupants exited the vehicle, a pat down revealed that one of the occupants had a small amount of cannabis. These circumstances in their totality suggest that the officers' safety was at risk. The risk to officer safety escalated when residents surrounded the scene and yelled at the officers, with at least one individual crossing into the scene.

¶ 69 We further find the recent decision in *People v. Thomas*, 2019 IL App (1st) 170474, to be helpful. There, the defendant was charged with AUUW after police observed him hand off a gun to another person while in the common area of an unlocked multiunit apartment building and then flee upstairs to an apartment unit. *Id.* ¶ 1. The charges asserted that the defendant illegally possessed a handgun while not on his land or in his home and without a valid FOID card or CCL. *Id.* ¶ 3. The defendant filed a motion to quash his arrest and suppress evidence, which the trial court granted and the State appealed. *Id.* ¶ 1.

¶ 70 In his motion to quash and suppress, and in response to the State's appeal, the defendant argued that the officers lacked reasonable suspicion or probable cause to believe he was committing a crime because, pursuant to *Aguilar*, possession of a gun is not *per se* illegal and the police failed to ask him whether he had a valid FOID card or CCL prior to arresting him. *Id.* ¶ 35. The appellate court disagreed, noting that "mere gun possession was not the scenario that presented itself to police." *Id.* ¶ 40. The reviewing court examined the totality of the circumstances, specifically that the arresting officer had made multiple arrests for narcotics, gangs, and drugs in the neighborhood and was patrolling due to the activities of two rival gangs at the time of the incident; around 7:30 p.m., he observed the defendant loitering on the sidewalk in front of an apartment building; he fled into the apartment building upon seeing the officer; the officer entered the apartment building, where he observed the defendant and another man in the common area; the officer observed that the defendant had a firearm, which he handed to the second man and then fled to a second floor apartment unit and closed the door behind him; the second man threw the handgun on the landing and was detained; and the officer recovered the loaded firearm and went to the apartment unit, where a female inside opened the door and the officer arrested the defendant. *Id.* ¶¶ 4-7. The appellate court concluded that the totality of these circumstances "suggested criminal activity" (*id.* ¶ 40), which gave the officers not only a reasonable suspicion to make a *Terry* stop but probable cause to arrest him. *Id.* ¶¶ 38-39.

¶ 71 "The facts indicated a probability that defendant did not have the necessary gun licenses, that he had violated the FOID Card Act and the Concealed Carry Act with an illegal transfer to another individual, and that he had violated the Concealed Carry Act by exposing his gun in a semi-public place." *Id.* ¶ 38. The reviewing court held that a possible innocent explanation that the defendant possessed the requisite FOID card or CCL did not necessarily negate probable cause. *Id.* ¶ 39.

¶ 72 Defendant argues that his possession of the firearm was not sufficient for probable cause for unlawful use of a weapon because Officer Ferreras did not know if he possessed a valid CCL. However, as we have concluded, defendant did not possess the firearm in accordance with the Act when he was observed with the firearm in his hand and moving it about the vehicle, and thus, his conduct was not within the exception to the unlawful use of a weapon statute. Defendant also fails to acknowledge the entirety of the situation that arose, including

the valid traffic stop and the presence of approximately a dozen residents crowding the scene and yelling obscenities at the officers. Similar to *Colyar* and *Thomas*, it is when the totality of the circumstances is considered that we find a sufficient basis to support probable cause.

¶ 73   We also find defendant's reliance on the decisions in *People v. Horton*, 2017 IL App (1st) 142019, *vacated by* No. 122461 (Ill. Nov. 22, 2017) (supervisory order), and *People v. Thomas*, 2016 IL App (1st) 141040, *vacated by* No. 121947 (Ill. Sept. 27, 2017) (supervisory order), unpersuasive. Defendant contends that following *Aguilar*, "the police seeing a person possessing a handgun in public is no longer sufficient, without other evidence of a crime, to provide probable cause to arrest that person," citing *Horton* and *Thomas*. As defendant concedes, both of the cited decisions were vacated by the Illinois Supreme Court and ordered to be reconsidered in light of *People v. Holmes*, 2017 IL 120407. Judgments vacated by the supreme court are void and have no effect. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 116.

¶ 74   In *Thomas*, the appellate court did not enter a published opinion following the supervisory order by the supreme court but, rather, issued an unpublished Illinois Supreme Court Rule 23 (eff. Apr. 1, 2018) order in June 2018, prior to the filing of defendant's brief in December 2018. See *People v. Thomas*, 2018 IL App (1st) 141040-U. In the unpublished order, the Fifth Division of the First District of this court reversed its prior decision and affirmed the trial court's denial of the defendant's motion to quash arrest and suppress evidence. *Id.* ¶¶ 1, 3. There, the court found an in-person citizen tip describing the defendant and stating that the defendant possessed a gun to police officers while on patrol was sufficiently reliable for a brief stop. During the subsequent *Terry* stop, the defendant dropped a backpack as an officer was beginning a pat down search. The officer and his partner heard a "thud" in the backpack, and a gun was subsequently recovered from the backpack. *Id.* ¶¶ 10-14.

¶ 75   In its original decision, the *Thomas* court found the tip sufficiently reliable but held that it did not provide the officers with a reasonable suspicion of criminal activity based on the holding in *Aguilar* because "suspected criminal activity based on a statute that was void from its inception could not supply the officers with reasonable suspicion to effectuate the *Terry* stop." *Id.* ¶ 31. However, following the supreme court's decision in *Holmes*, the court found a different result was warranted, finding that the tip was sufficiently reliable for the officers to have a reasonable suspicion of criminal activity sufficient to justify a *Terry* stop of the defendant. *Id.* ¶ 33.

¶ 76   As for the *Horton* case, the reviewing court recently issued a new opinion. *People v. Horton*, 2019 IL App (1st) 142019-B. We disagree with the majority in *Horton* and also find it distinguishable from the facts of this case based on one significant difference. In *Horton*, the majority concluded that the arresting officer did not observe the defendant with a gun in his hand but, rather, had a "hunch" that the defendant possessed a firearm because he observed a metallic object in the defendant's waistband that may or may not have been a handgun and then pursued the defendant who fled the scene. *Id.* ¶ 1.

¶ 77   In that case, at the suppression hearing, the officer was on patrol in an unmarked squad vehicle with his partner in Chicago when the officer observed the defendant with two other people in front of a house. The defendant turned and looked at the officer, and at that point, the officer observed a " 'metallic object' " in the defendant's waistband. *Id.* ¶ 15. The officer asked his partner to stop the vehicle. As the officers were exiting the vehicle, the defendant made eye contact with the officer and then fled into the house. When the officers approached

the house, they found a set of keys on the ground, which they used to enter the house. One of the officers heard a noise upstairs. The officers then went upstairs and found the defendant crouched next to a bed. A handgun was found under the mattress of the bed. *Id.* ¶¶ 15-16, 103. The defendant denied living in the house as well as ownership of the firearm. *Id.* ¶ 16. The trial court denied the defendant's motion to suppress, and following a jury trial, the defendant was found guilty of being an armed habitual criminal. *Id.* ¶¶ 22, 43.

¶ 78    On appeal, the majority concluded that "the record does not support a finding of probable cause to believe that [the defendant] had a gun at all" and the officer admitted that he had not seen the defendant violate any law. *Id.* ¶ 57. The *Horton* court reasoned, "[a] belief that a defendant 'may or may not' possess a weapon is simply a hunch and does not reach the threshold of probable cause." *Id.* The court further held that even if the officers had probable cause to believe the defendant had a gun, the officers' observations did not support probable cause that the defendant was committing a crime. The reviewing court observed that under the pre-*Aguilar* version of the AUUW statute, it was not a crime to possess a firearm in one's land or abode or as an invitee to another's abode with permission. *Id.* ¶ 59. "Nothing in the record suggests that [the officer] had any reason to believe, at the time of the arrest, that [defendant] was not standing in his own yard or a friend's yard. In other words, no reason to believe that [the defendant] was committing a crime." *Id.* In contrast, Officer Ferreras observed defendant with a firearm in his hand and then place it in a glove compartment during a traffic stop. For these reasons, we find the circumstances in *Horton* to be distinguishable from the instant case.

¶ 79    Additionally, we agree with the dissent's analysis and conclusion that the record showed "conclusively that reasonable, articulable facts, deemed credible by the trial court, were presented by the State in support of this arrest." *Id.* ¶ 106 (Pierce, J., dissenting.) The dissent further found that "the evidence known to the officers at the time of the arrest supports a reasonable belief that [the defendant's] possession of a gun was illegal, and they had every right to continue to investigate." *Id.* ¶ 110. The dissent reasoned that the officer's initial attempted contact would have been a valid *Terry* stop, but this contact did not occur because the defendant fled. *Id.* "It cannot reasonably be argued that the circuit court was in error in finding that an experienced police officer seeing a person in possession of what appeared to be a gun did not have a reasonable articulable suspicion of criminal activity that entitled him to make further inquiry." *Id.* ¶ 113.

> "Should a reasonable officer have ignored what he just saw? Common sense and human experience compels the conclusion that the last thing our citizens want is for police officers to shrug their shoulders and continue down the street when they see someone with a gun run away at the mere glance at a police officer, especially given the current level of violence in this city. There is nothing illegal or unreasonable about the police conduct in this case. Defendant's conduct does not defeat a finding that the officers had reasonable suspicion to justify their pursuit of the defendant. The officers were properly in the house and the recovery of the handgun from underneath the mattress was proper. Clearly, probable cause existed to arrest defendant. Finally, any implication that there is a temporal component to specifically knowing which law has been violated at the time of arrest must soundly be rejected. The totality of the circumstances provided the officers with probable cause to arrest the defendant for possession and to thereafter continue to investigate and charge, or not, defendant with any and all applicable criminal violations." *Id.* ¶ 120.

- 17 -

¶ 80    Defendant has not cited any valid case law to support his argument that, post-*Aguilar*, probable cause cannot be supported by open possession of a firearm when an individual is stopped for a valid reason, such as, a traffic stop.

¶ 81    Since we have concluded that Officer Ferreras had sufficient probable cause to arrest defendant, a motion to quash arrest and suppress evidence would not have been meritorious and cannot sustain a claim of ineffective assistance of counsel. Because the arrest was proper, we need not consider whether the evidence obtained following the arrest should have been suppressed.

¶ 82    Next, defendant asserts that the State failed to prove him guilty of UUWF beyond a reasonable doubt because Officer Ferreras's testimony was "improbable, illogical, and contrary to human experience." The State maintains that it was the trial court's responsibility to assess credibility and we are to defer to the trial court's findings.

¶ 83    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Wright*, 2017 IL 119561, ¶ 70. "Under this standard a reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *Wright*, 2017 IL 119561, ¶ 70.

¶ 84    The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Id.* "A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *Wright*, 2017 IL 119561, ¶ 70.

¶ 85    According to defendant, Officer Ferreras's testimony that he did not inform the other officers at the scene about his observation of defendant placing a weapon in the glove compartment was improbable, illogical, and contrary to human experience. Defendant raises multiple reasons why Officer Ferreras's testimony was not believable. First, he contends that the officer's explanation that he did not notify anyone because he was concerned about the hostile environment at the scene and his priority was the safety of the officers and the vehicle occupants "defies logic." Second, defendant reasons that since Officer Edwards testified that the rear windows were tinted and she could not see any activity in the vehicle, then it "defies belief" that Officer Ferreras could observe a weapon in defendant's possession. Third, defendant asserts that Officer Ferreras's explanation regarding why he and Officer Raske did not wear gloves while handling the weapon was "improbable and contrary to human experience." Fourth, defendant argues that Officer Ferreras's testimony about why the other occupants of the vehicle were transported to the Fifth District was implausible and undermined the credibility of his testimony.

¶ 86    Defendant has not established reasonable doubt under the sufficiency of the evidence standard because all of these claims relate to the credibility of Officer Ferreras's testimony.

Officer Ferreras's reasoning for all of these alleged shortcomings were presented to the trial court. The court, as the trier of fact, was tasked with resolving all conflicts and inconsistencies.

¶ 87 According to defendant, it was illogical not to notify the officers at the scene of the presence of weapon in the vehicle. However, the trial court in its ruling acknowledged the unusual circumstances of the traffic stop. The court found the officer's testimony credible to explain his "snap decision" not to inform his partners to protect the officers, the vehicle occupants, and the individuals on the street. There are many reasons why the officer chose not to notify the other officers immediately. At that time, four individuals were in the vehicle and one weapon had been observed. There was no way for Officer Ferreras to know if more weapons were present. If he called out to his partners who were behind him and on the other side of the vehicle, he would likely have informed the occupants of what he had observed and created a potentially dangerous situation. Moreover, by the time the occupants were removed from the vehicle, the scene had become hostile with the residents' presence. The testimony established that this was not a routine traffic stop as it became a hostile environment when approximately 10 citizens came to the scene yelling profanities at the officers and attempting to disrupt the investigation. The officers then decided to continue the investigation at the station when the assisting officers arrived. The presence of additional officers in a hostile environment does not render Officer Ferreras's decision improbable and unworthy of belief.

¶ 88 Defendant further contends that Officer Ferreras's decision not to notify Officer Edwards about the weapon in the glove compartment while she drove it to the police station undermined his testimony about his safety concerns. We find Officer Ferreras's explanation of his decision to be credible. Officer Ferreras did notify Officer Raske as the officers drove to the station. Officer Edwards was driving the minivan by herself, the presence of the weapon in the glove compartment was not a danger to her at that time. The notification was not necessary for her safety or for the investigation while she was driving the vehicle. We cannot say that the trial court's credibility assessment of Officer Ferreras's decision not to inform his partners about the weapon at the scene was "so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." See *id.*

¶ 89 Further, we reject defendant's reasoning that because Officer Edwards was unable to observe the occupants due to the tinted rear windows, it was improbable that Officer Ferreras was able to see in the front window. No evidence was presented that the front windows were tinted. While Officer Edwards testified that the rear windows were tinted, she offered no testimony regarding the front windows.

¶ 90 Defendant also calls attention to Officer Ferreras's testimony that the weapon was recovered without gloves. When asked if the use of gloves to handle a weapon was protocol, Officer Ferreras responded, "If available," and stated he did not have gloves at that point in time. Again, this is a credibility issue left to the trier of fact. Further, this testimony was not contested.

¶ 91 Defendant finally argues that Officer Ferreras's testimony failed to explain why all of the occupants were transported to the Fifth District. We disagree. At that scene, Officer Ferreras had observed defendant with a weapon and a small amount of cannabis was discovered on another occupant. The scene then became hostile, which prohibited an investigation at that location. The officers decided to continue the investigation at the police station for the safety of the officers as well as the vehicle occupants. Whether Officer Ferreras's explanation for

transporting all of the vehicle occupants was credible was a question for the trial court, we will not disturb it on review.

¶ 92     Finally, defendant argues that the State failed to prove actual or constructive possession of the weapon. The State responds that it presented sufficient evidence of actual possession when Officer Ferreras testified that he observed a firearm with an extended magazine in defendant's hands when defendant placed the weapon in the glove compartment of the vehicle. No argument of constructive possession was made by the prosecutors at trial, and we will not consider it on appeal.

¶ 93     To prove a defendant guilty of UUWF, the State must present evidence to establish beyond a reasonable doubt that (1) defendant has a prior felony conviction and (2) the defendant knowingly possessed a weapon. 720 ILCS 5/24-1.1(a) (West 2016). Here, it is undisputed that defendant had a prior felony conviction for robbery. Defendant contends that the State failed to establish that he knowingly possessed a weapon.

¶ 94     Possession may be actual or constructive. *People v. Givens*, 237 Ill. 2d 311, 335 (2010). "Actual possession is the exercise by the defendant of present personal dominion over the illicit material and exists when a person exercises immediate and exclusive dominion or control over the illicit material, but does not require present personal touching of the illicit material." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000)). Stated differently, actual possession is proven by testimony that shows that the defendant exercised some form of dominion over the weapon, such as trying to conceal it or throwing it away. *People v. Love*, 404 Ill. App. 3d 784, 788 (2010). "[W]here possession has been shown, an inference of culpable knowledge can be drawn from the surrounding facts and circumstances." *Givens*, 237 Ill. 2d at 335. "Whether there is knowledge and whether there is possession or control are questions of fact to be determined by the trier of fact." *Schmalz*, 194 Ill. 2d at 81.

¶ 95     The crux of defendant's argument is the same as his other claims of reasonable doubt, that Officer Ferreras's testimony is not credible. However, the trial court heard Officer Ferreras's testimony that he observed defendant from approximately 5 to 10 feet away possessing a firearm with an extended clip and then placing the weapon in the glove compartment. During the subsequent search of the vehicle, a 9-millimeter handgun with an extended magazine containing 12 live rounds was recovered from the glove compartment. Officer Ferreras's testimony established that defendant exercised dominion over the weapon by personally concealing it in the glove compartment when the officers were approaching the vehicle. The trial court found such testimony to be credible and sufficient proof of possession of the weapon. After reviewing the evidence in the light most favorable to the State, we cannot say that the evidence was so improbable that no rational trier of fact could have found defendant possessed a firearm and was guilty of UUWF beyond a reasonable doubt.

¶ 96     Based on the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 97     Affirmed.