2022 IL App (1st) 192204-U

No. 1-19-2204

Order filed March 2, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 37 |
| | ) | |
| RAYMOND POOLE, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for aggravated unlawful use of a weapon is affirmed over his contentions that the trial court should have granted his motion to suppress a firearm recovered from his person, trial counsel rendered ineffective assistance, and the State failed to prove the *corpus delicti* of the offense.

¶ 2    Following a bench trial, defendant Raymond Poole was found guilty of aggravated

unlawful use of a weapon (AUUW) and sentenced to 12 months' imprisonment. On appeal,

defendant argues that (1) the trial court should have suppressed a firearm recovered from his person

as the product of an unlawful frisk under *Terry v. Ohio*, 392 U.S. 1 (1968); (2) trial counsel rendered ineffective assistance by failing to impeach an officer with video from his body camera and failing to challenge probable cause for defendant's arrest; and (3) the only evidence that defendant had not been issued a valid Firearm Owner's Identification (FOID) card or concealed carry license (CCL) was his own statement, in violation of the *corpus delicti* rule. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4     Defendant was charged with six counts of AUUW. Relevant here, count III alleged that, on November 25, 2017, he knowingly carried in a vehicle an uncased, loaded, and immediately accessible firearm when he had not been issued a currently valid FOID card or CCL.[1] (720 ILCS 5/24-1.6(a)(1)/(3)(A-5)(C) (West 2016)).

¶ 5                         A. Motion to Suppress Evidence

¶ 6     Prior to trial, defendant filed a motion to suppress evidence, which stated that he was arrested during a traffic stop in Chicago on November 25, 2017.[2] He argued that police lacked reasonable suspicion or probable cause to stop the vehicle in which he was a passenger, and that they lacked probable cause to arrest him or search him. Defendant requested that the trial court suppress all physical evidence and statements that were products of his unlawful arrest.

¶ 7                         B. Suppression Hearing and Trial

¶ 8     The court held a hearing on defendant's motion to suppress and a bench trial simultaneously. Officers Ryan Graal and Juan Gali both testified that they were on duty, wearing

---

[1] The State *nol-prossed* the other five counts prior to trial.

[2] Defendant was initially represented by private counsel, who filed the first motion to suppress in this case. Private counsel was given leave to withdraw before the trial court ruled on that motion. Thereafter, defendant's appointed assistant public defender filed a second motion to suppress. That is the motion that the trial court heard and denied, and that is at issue on appeal.

plainclothes, and riding in an unmarked police vehicle that Gali was driving on November 25, 2017. At approximately 9:43 p.m., they saw a black BMW on 71st Street make a right turn onto Lafayette Avenue without using a turn signal and pulled the BMW over. Graal approached the BMW's passenger side and Gali approached the driver side. The driver complied with Gali's order to lower the BMW's dark tinted windows, and the officers saw three people in the vehicle. Defendant, whom both officers identified in court, was in the rear passenger seat.

¶ 9     Gali testified that he saw defendant "messing with a bulge on the – towards – between his, like, right hip and his front of his waistline" with his right hand. Graal was removing the front passenger from the BMW, so Gali told Graal to "stop, the guy in the back was moving." Gali called for backup and saw defendant moving his left hand. Graal testified that he saw Gali nod toward defendant in the rear seat, which he understood to mean "[t]hat there was something dangerous at that time." Graal saw defendant "continually moving" his right hand toward his waistband and eventually touching his waistband. Graal told defendant not to move his hands, then handcuffed defendant's right hand to the front passenger's right hand through the BMW's windows. Graal then saw defendant "attempt to move his left hand towards his waistband," so he handcuffed defendant's left hand to his right hand. Graal "conducted a protective pat-down of the defendant" and felt a "hard object in the shape of the butt of a handgun" at defendant's "right waistband area." Graal acknowledged that his arrest report did not state that he saw defendant make movements toward his waistband, but it did indicate that Gali saw defendant "adjust his waistband area twice."

¶ 10    Backup officers arrived, including an Officer Pazan, who helped Graal remove defendant from the BMW. Graal testified that he recovered a loaded semiautomatic firearm from defendant. Defendant was arrested and transported to a police station, where Graal inventoried the firearm. In

court, Graal identified the firearm he recovered from defendant as a .40-caliber Smith & Wesson with one live round in the chamber and five rounds in the magazine. The State moved the firearm and its ammunition into evidence.

¶ 11    Both officers testified that they spoke to defendant at the police station at approximately 11:00 p.m. Gali advised defendant of his *Miranda* rights and defendant indicated that he understood them. Gali asked defendant if he had a FOID card or a CCL and defendant said, "Not at the moment." Gali then asked defendant "if he had applied for one," and defendant "said he did."

¶ 12    Graal identified video recordings from his and Pazan's body cameras and Gali identified two video recordings from his body camera. Both officers confirmed that the recordings accurately portrayed this incident. The State moved all four video recordings into evidence. The first video from Gali's body camera depicts him approaching the driver side of the BMW, which has tinted black windows. Gali orders the occupants to roll the windows down, and they comply. There are two men in the driver and front passenger seats. Gali orders the driver to step out, which he does. Defendant can be seen through the rear driver-side window. That window is only lowered halfway, so only defendant's head and upper body are consistently visible. However, defendant's hands and lower body are periodically visible through the tinted window depending on the lighting. Defendant's hands are together in front of his body as the driver exits the BMW. As Gali moves the driver toward the rear of the BMW, he tells Graal to "hold on." Graal shines his flashlight through the rear passenger-side window and defendant's right hand is above his right thigh. Defendant then puts his hands together in front of his body. Graal reaches through the rear passenger-side window, pulls defendant's right wrist through the window, and cuffs it. Gali says,

"Watch his right side. His right side. Graal, he keeps on reaching for his right side." The second video from Gali's body camera depicts his interview of defendant at the police station and is consistent with his testimony.

¶ 13    The video recording from Graal's body camera depicts the top of a black sedan stopped on the side of a street. Graal is standing between the front and rear passenger-side windows. Graal opens the front passenger-side door and orders the passenger to exit, but Gali says, "Hold on." Graal leans toward the open rear passenger-side window and tells defendant, "Yo, dude, think about what you're about to do, all right? Think about it. 'Cause right now, you don't want it to go bad." Defendant's left hand is on his left knee and his right hand is not in the frame of Graal's body camera. Graal grabs the front passenger's right wrist and handcuffs it to defendant's right wrist through the passenger-side windows.

¶ 14    Graal then opens the rear passenger-side door and says, "Hey, do not move your f*****g hand!" Defendant's left hand is on his left knee and then on the seat next to him. Graal leans through the open rear passenger-side door and pats defendant's waist with his palm, then cuffs defendant's left wrist to his right wrist. Graal leans in again and touches defendant's left upper leg. He identified this as the "protective pat-down" in which he felt the "hard object [he] believed to be the butt of a firearm."[3] Graal puts his flashlight between defendant's arms, pointing downward, and asks, "Where is it?" then says, "Hey! I got it out of his waistband." Gali says "Wait 'til we get a car." Seconds later, other officers arrive. Along with Graal, they remove defendant and the front passenger from the BMW and stand them up with their backs against the vehicle. Graal walks to

---

[3] The State stopped playing Graal's body camera video at this point, but the entire video was moved into evidence, and the entire video is part of the record on appeal.

a police vehicle nearby, sets a magazine on the hood, holds up a firearm, and says, "Here's the pistol from his waistband."

¶ 15    The State then played a portion of Pazan's body camera video. The video depicts Pazan approaching the parked BMW on foot after exiting his police vehicle. Multiple officers are on the passenger side of the BMW. Defendant is removed from the vehicle and placed standing with his back against it. An officer lifts his shirt, and the handle of a firearm protrudes from the top of his pants, at the center-right of his waist. In court, Graal identified it as "the firearm that [he] recovered from the defendant." Graal also identified a still photograph of the firearm in defendant's waistband, which was taken from Pazan's body camera video recording. The State moved this photograph into evidence.

¶ 16    Gali also testified that he saw a green bottle of Remy Martin with a red label on the center of the rear passenger seat "prior to asking the driver for his driver's license." He testified that this bottle was "open," but also testified that "there was a cap on the bottle." He never removed the cap or smelled or tasted its contents, but he "could see it was missing alcohol." Gali identified a still photograph from a video recording taken by the body camera of an Officer Soto and testified that it portrayed the bottle of Remy Martin in the rear seat of the BMW. Soto's body camera video recording, which is in the record on appeal, depicts him recovering a green bottle with a red label from the rear seat of the BMW after the occupants of the vehicle had been removed.

¶ 17    James Weekly testified for the defense that he was convicted of felony possession of a controlled substance in a 2012 case. Defendant, whom he identified in court, was his close friend. Weekly, defendant, and Sheldon Lewis were in Weekly's black BMW near 71st and State at approximately 9:30 p.m. on November 25, 2017. Weekly was the driver, and he was heading

eastbound on 71st Street. The three men were coming from a gas station at 71st and Vincennes and, prior to that, a family gathering at Lewis's home. Weekly could not remember their destination that night.

¶ 18    Weekly activated his turn signal before he reached the intersection of 71st and Lafayette, then stopped behind multiple cars at the intersection's red light. When the light turned green, Weekly turned right, saw blue lights behind him, and pulled over. Officers approached and ordered Weekly to lower the windows and provide his license, registration, and insurance; he complied. An officer then ordered Weekly out of the BMW and handcuffed him. While handcuffed, Weekly stood near the rear of the BMW, facing toward it. He was looking over the top of the BMW and could not see into the rear seat. The officers then removed defendant and Lewis from the BMW, but Weekly did not see what happened to them, because the officers told him "to walk off or, like, go by another squad." Weekly was issued tickets for failing to signal a turn and for illegal transportation of alcohol and was released to drive home. Weekly denied that there was a bottle of Remy Martin in his BMW.

¶ 19    With respect to the motion to suppress, defendant argued that Weekly's testimony established that no traffic violation occurred, so the officers' stop of the BMW was unlawful. Defendant also contended that the video recordings did not show him moving his hands as the officers claimed.

¶ 20    The court denied defendant's motion to suppress. It found that Weekly's claim that he used a turn signal was not credible because of his prior conviction, and because he remembered using the turn signal and where he was coming from, but not where he was going when he was pulled over. The court then found defendant guilty of AUUW. It explained that "there was an admission

by [defendant] that he did not have a FOID card or concealed carry license at the time that they asked him at the police station. And there's also evidence of the gun being recovered from him."

¶ 21 Defendant filed a motion for a new trial, which argued that the State failed to prove the *corpus delicti* of AUUW premised on the fact that he had not been issued a valid FOID card and CCL because the only evidence of that element was his admission. He also filed a motion to reconsider, which contended that the trial court should have granted his motion to suppress because "the police did not have a reasonable, articulable suspicion to stop the car," so "the search of [defendant] and his subsequent arrest was in violation of the Fourth Amendment." The trial court denied both motions.

¶ 22 The court sentenced defendant to 12 months' imprisonment. Defendant filed a motion to reconsider sentence, which was denied.

¶ 23 Defendant timely appealed.

¶ 24 II. ANALYSIS

¶ 25 On appeal, defendant challenges the denial of his motion to suppress, the effectiveness of trial counsel, and the State's proof of the *corpus delicti* of AUUW.

¶ 26 A. Motion to Suppress Evidence

¶ 27 Defendant first argues that the trial court should have granted his motion to suppress the firearm because the officers "lacked a reasonable belief that he was armed and dangerous" to justify Graal's frisk of him. At a hearing on a motion to suppress, the defendant has the burden to make a *prima facie* case that the evidence in question was obtained by an illegal search or seizure. *People v. Brooks*, 2017 IL 121413, ¶ 22. Thus, the defendant must establish the factual and legal basis for the motion to suppress. *Id.* If the defendant makes a *prima facie* case, the burden shifts to

the State to present evidence to counter the defendant's *prima facie* case. *Id.* The ultimate burden of proof remains with the defendant. *Id.*

¶ 28    We review the denial of a motion to suppress under a two-part standard. *Id.* ¶ 21. We give great deference to the trial court's findings of fact, which we reverse only if they are against the manifest weight of the evidence. *Id.* However, we give less deference to factual findings based on video evidence because, unlike live witness testimony, a trial court does not occupy a position superior to the appellate court in evaluating video evidence. *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29. We review *de novo* whether police had reasonable suspicion to frisk a defendant. *Brooks*, 2017 IL 121413, ¶ 21. In reviewing the trial court's ruling on a motion to suppress evidence, we consider the evidence adduced at trial as well as at the suppression hearing. *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 41.

¶ 29    Both the United States Constitution and the Illinois Constitution prohibit unreasonable searches and seizures by police. See U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Generally, searches and seizures are reasonable if they are supported by a warrant establishing probable cause. *People v. Jones*, 215 Ill. 2d 261, 269 (2005). However, police may detain an individual without a warrant or probable cause if they have reasonable suspicion that he has committed or is about to commit a crime. *Terry*, 392 U.S at 38. Traffic stops are analogous to *Terry* stops, so we analyze traffic stops under the principles of *Terry*. *People v. Cummings*, 2016 IL 115769, ¶ 13. The seizure of a vehicle and its occupants is lawful if police have reasonable suspicion to believe that a traffic violation occurred. *People v. Hackett*, 2012 IL 111781, ¶ 20.

¶ 30    On appeal, defendant does not challenge the lawfulness of the officers' initial stop of the BMW. The officers' stop of the BMW was justified based on their observation of a traffic

violation. See *Id.* However, that is a separate question from whether Graal's frisk of defendant was valid, which is what defendant challenges. See *People v. Sorenson*, 196 Ill. 2d 425, 433 (2001). The fact that an officer has reason to stop a person does not automatically justify a search for weapons. *Id.* During a traffic stop, an officer may conduct a pat-down frisk of a passenger if the officer has reasonable suspicion to believe that the passenger is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). The officer need not be certain that the passenger is armed; rather, the issue is whether a reasonably prudent officer in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry*, 392 U.S. at 27.

¶ 31    We find that Graal's frisk of defendant was supported by a reasonable suspicion that he presented a danger to the officers' safety. The officers' testimony established that Gali saw defendant moving a bulge near his waistband and alerted Graal to this behavior, which Graal took as a sign that "there was something dangerous." Graal then saw defendant move his hand toward his waistband, confirming what Gali had just told him. Graal cuffed defendant's right hand to the front passenger's right hand, but defendant continued trying to touch his waistband with his uncuffed left hand. At that point, Graal cuffed defendant's left hand, patted the outside of his pants, and felt a "hard object in the shape of the butt of a handgun" at defendant's "right waistband area." As discussed more extensively below, the body camera videos do not directly depict these hand movements, but they also do not disprove that defendant moved his hands as Graal and Gali testified. The officers' testimony established that defendant had a suspicious bulge in his clothing near his waistband and tried to touch or adjust that bulge multiple times with both hands, even after being ordered not to do so, and even after one of his hands was cuffed. Defendant's behavior

suggested that he was trying to conceal, or perhaps draw, a weapon from his waistband. Thus, it was reasonable for Graal to frisk defendant to determine whether he was, in fact, armed.

¶ 32    In addition, the body camera videos provided circumstantial evidence supporting a finding of reasonable suspicion that defendant was armed and dangerous. The videos confirm that Gali told Graal to stop removing the front passenger from the BMW and to focus on defendant instead. This corroborates Gali's testimony that he saw defendant behaving in a way that suggested danger to the officers' safety. The videos also show that Graal frisked defendant, but not the front seat passenger. This suggests that Graal noticed something about defendant, specifically, that caused him to believe that defendant presented a threat. Moreover, prior to frisking him, Graal told defendant, and only defendant,  to "think about what [he's] about to do, all right? Think about it." A rational factfinder could conclude that Graal saw some sort of threatening behavior from defendant that prompted this statement. At the same time, Graal was mostly unconcerned with the front passenger and his complaints that his arm hurt. Altogether, the officers' behavior was markedly different toward defendant than the other two occupants of the BMW, supporting an inference that defendant, specifically, presented a threat to the officers.

¶ 33    Safety concerns also supported Graal's frisk of defendant. The BMW's windows were tinted black and difficult to see through when the officers first approached it. When the windows were lowered, the officers saw that they were outnumbered two to three. Graal had to handle the two passenger-side occupants of the vehicle by himself while he and Gali waited for assisting units. The touchstone of the fourth amendment is reasonableness (*People v. Timmsen*, 2016 IL 118181, ¶ 9), and Graal's frisk of defendant was reasonable to protect himself and his partner until backup arrived. Thus, the trial court correctly denied defendant's motion to suppress.

¶ 34    Defendant attempts to isolate each factor that supported reasonable suspicion and argues that each factor alone is insufficient. For example, he claims that "[s]tanding alone, [his] movements toward the alleged bulge were wholly ambiguous and did not provide a reasonable, articulable basis for a patdown." However, we do not assess reasonable suspicion by examining each fact independently. Rather, we consider the totality of the circumstances. *People v. Evans*, 2017 IL App (4th) 140672, ¶ 47; see also *United States v. Arvizu*, 534 U.S. 266, 275 (2002) (reasonable suspicion analysis is a "factual mosaic."). For instance, defendant continued reaching for the bulge *after* being ordered not to move his hands and even after being handcuffed. Considering all the facts as they occurred in real time, it is difficult to imagine what more would have been necessary to justify Graal's frisk of defendant. Certainly, it would not have been reasonable for Graal to wait until defendant drew his firearm to start frisking him for weapons. We note that Graal did not even remove the firearm from defendant's waistband until assisting officers arrived. Graal simply frisked defendant to confirm his suspicion that defendant was armed. That is reasonable police behavior.

¶ 35    The cases that defendant cites are distinguishable and do not warrant reversal. See, e.g., *People v. Smith*, 2015 IL App (1st) 131307, ¶ 28 (the defendant complied with officer's orders); *People v. Surles*, 2011 IL App (1st) 100068, ¶ 36 ("the information available to the officers at the time was that a vehicle had failed to stop at a stop sign and its operator could not produce a valid driver's license" in "a high-crime area"); *People v. Creagh*, 214 Ill. App. 3d 744, 748 (1991) (the officer's testimony "clearly established that the bulge in defendant's right pants pocket was soft, rather than hard, and did not resemble a gun or any other weapon."). Accordingly, we find that the

trial court did not err in denying defendant's motion to suppress to the extent that it was premised an allegedly unlawful *Terry* frisk.

¶ 36                                    B. Ineffective Assistance of Counsel

¶ 37    Defendant next argues that trial counsel rendered ineffective assistance by (1) failing to file a motion to suppress the firearm and his statements on the grounds that, "even after recovering the firearm from [defendant], the officers lacked probable cause to arrest him where they had no reason to believe that [defendant] did not have the legal right to possess a gun;" and (2) failing to publish certain portions of the body camera videos that would have impeached Gali.

¶ 38    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I § 8. We review claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. " 'To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant.' " *Id.* ¶ 30 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 36). "Specifically, 'a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Domagala*, 2013 IL 113688, ¶ 36). "A 'reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' " *People v. Simpson*, 2015 IL 116512, ¶ 35 (quoting *Strickland*, 466 U.S. at 694)). "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *Id.*

¶ 39                                    1. Failure to Argue Unlawful Arrest

¶ 40    Defendant contends that counsel was ineffective for failing to file a motion to suppress both the firearm and his statements at the police station premised on the officers' lack of probable cause to arrest him because, under *People v. Aguilar*, 2013 IL 112116, it is not categorically illegal to possess a firearm in public.[4] In *Aguilar*, the Illinois Supreme Court struck down as unconstitutional a comprehensive ban on carrying "ready-to-use guns outside the home." *Id.* ¶¶ 19, 21. However, *Aguilar* recognized that the right to possess a firearm outside the home is subject to "meaningful regulation" (*Id.* ¶ 21), including requirements that a person must carry a FOID card (430 ILCS 65/2 (West 2016)) and a CCL ((430 ILCS 66/10, 25 (West 2016)).

¶ 41    In the context of a claim that counsel was ineffective for failing to file a motion to suppress, a defendant must establish prejudice by demonstrating that "the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15. The decision whether to seek suppression of evidence is generally a matter of trial strategy that will not support a claim of ineffective assistance. *People v. Balark*, 2019 IL App (1st) 171626, ¶ 34.

¶ 42    Defendant has not established prejudice with respect to this claim of ineffective assistance for two reasons. First, the firearm was the product of a *Terry* frisk, not an arrest or a search incident to arrest. Graal frisked defendant in the back seat of the BMW and felt the firearm in defendant's waistband. The body camera videos establish that, approximately one minute later, assisting officers removed defendant from the BMW, and 30 seconds after that, Graal recovered the firearm

---

[4] Defendant's written motion to suppress did assert lack of probable cause for defendant's arrest. Specifically, the motion argued that "[t]he conduct of defendant prior to his arrest was such as would not reasonably be interpreted by the arresting officers as constituting probable cause that the Defendant had committed or was about to commit a crime." However, at the suppression hearing, counsel's argument focused on the lawfulness of the traffic stop, not defendant's arrest.

from defendant's waistband. At some point thereafter, defendant was arrested and transported to the police station.

¶ 43    Second, the officers had probable cause to arrest defendant. A warrantless arrest is valid only if it is supported by probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *Id.* Probable cause depends upon the totality of the circumstances at the time of the arrest, including the officers' law enforcement experience. *Id.* Whether probable cause exists is governed by common sense considerations and examines the probability of criminal activity, not proof beyond a reasonable doubt of it. *Id.*

¶ 44    Under *Aguilar*, police cannot simply assume that a person in possession of a firearm in public has committed a crime. *People v. Thomas*, 2019 IL App (1st) 170474, ¶ 40. However, the fact that the officers did not know for certain that defendant lacked a FOID card and a CCL when they arrested him does not mean that they just assumed that he committed a crime. Rather, the totality of the circumstances supported a reasonable belief that defendant possessed the firearm illegally. "A reasonable person who was not committing a crime (*i.e.*, who had the valid licenses) would be expected to tell the officers he was licensed to have and carry a gun." *People v. McMichaels*, 2019 IL App (1st) 163053, ¶ 38. Defendant had multiple opportunities to tell the officers that he lawfully possessed the firearm: when Graal first approached and warned him to think about what he was doing, when Graal frisked him and asked where "it" was, when the officers pulled him out of the BMW, and when the officers lifted his shirt and recovered the gun. Given defendant's behavior, the officers were justified in arresting defendant based on the belief

that he unlawfully possessed the firearm. See *id.* ¶ 39 ("even though the officers did not inquire about whether defendant had a valid license, the officers were fully justified in detaining and arresting defendant before they could confirm his licensure and the lawfulness of the possession of the gun."). Because the officers had probable cause to arrest defendant, a motion to suppress the firearm and his statements premised on his allegedly unlawful arrest would not have been meritorious, and defendant has failed to establish prejudice under *Strickland*.

¶ 45    Defendant argues that "the arresting officers had absolutely no reason to believe that [his] possession of a gun was illegal." We disagree. The officers did not *know* that defendant's possession of a firearm was illegal, but they had reasonable suspicion to *believe* that it was. In addition to the facts discussed above, the officers apparently found no FOID card or CCL despite recovering defendant's wallet and thoroughly searching the BMW, as the body camera videos depict. Thus, it was reasonable for them to believe that defendant did not have a FOID card or CCL, and that his possession of the firearm was unlawful.

¶ 46    We are unpersuaded by defendant's citation of *People v. Horton*, 2017 IL App (1st) 142019, ¶ 50, for the proposition that "[p]ost-*Aguilar*, the possible observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest." *Horton* was vacated by the Illinois Supreme Court and provides no precedential value.[5] *Balark*, 2019 IL App (1st) 171626, ¶ 73. *People v. Bloxton*, 2020 IL App (1st) 181216, is also unhelpful because, in that case, we found that police did not even have reasonable suspicion to conduct a *Terry* stop of the defendant, so they necessarily lacked probable cause to arrest him. *Id.*

---

[5] The post-vacatur opinion, *People v. Horton*, 2019 IL App (1st) 142019-B, does not include the language that defendant quotes.

¶ 21. By contrast, in this case, the testimony of the officers showed that the driver did not use his turn signal when making a right turn, which gave the officers reasonable suspicion for the stop that led to the discovery of defendant's illegal possession of a firearm. Accordingly, we find that defendant has failed to carry his burden with respect to this claim of ineffective assistance of counsel.

¶ 47                                    2. Failure to Impeach Gali

¶ 48    Defendant next argues that trial counsel was ineffective for failing to offer into evidence certain portions of the body camera videos that would have impeached Gali. Specifically, defendant argues that the body camera videos would have impeached Gali because they (1) recorded him saying that defendant was "reaching" toward his waistband, not "messing with" it as he testified at trial; (2) do not record him mentioning a bulge in defendant's clothing; and (3) do not show an open container of alcohol visible in the rear seat of the BMW when Gali approaches the vehicle. Generally, the decision whether to cross-examine impeach a witness is a matter of trial strategy that cannot support a claim of ineffective assistance. *People v. Franklin*, 167 Ill. 2d 1, 22 (1995). "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997). Even if we find that counsel should have attempted the impeachment that defendant now claims, defendant still fails to show that his counsel's failure to do so constituted prejudice, as we describe below.

¶ 49    Defendant has not established prejudice with respect to this claim of ineffective assistance. At trial, counsel highlighted the most significant flaw in Gali's testimony: that the body camera videos do not show defendant moving his hands as Gali claimed. The trial court rejected that

challenge to Gali's credibility. Thus, we cannot see how the relatively minor impeachment that defendant now raises would have produced a different outcome. In addition, most of the evidence supporting reasonable suspicion that defendant was armed and dangerous came from Graal, not Gali. Graal testified that defendant had a bulge under his clothing, that he moved the bulge in defiance of orders not to move his hands and after his right hand was cuffed, and that the bulge was a hard object that felt like the butt of firearm. So, even if the trial court had completely disregarded Gali's testimony, it still could have found reasonable suspicion to support Graal's frisk of defendant based on Graal's testimony alone. Thus, defendant has failed to establish that the outcome of the proceeding would have been different had counsel impeached Gali in the manner described above.

¶ 50    Defendant argues that the trial court's ruling was based on credibility determinations and, had it "been shown video contradicting Officer Gali's testimony, it certainly might have made different credibility determinations." What the trial court might or might not have done is speculation, and speculation cannot establish prejudice. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008) ("*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice."). Accordingly, this claim of ineffective assistance fails.

¶ 51                                C. *Corpus Delicti*

¶ 52    Finally, defendant argues that his conviction for AUUW should be reversed because the only evidence that he had not been issued a valid FOID card or CCL was his own statement to the officers, in violation of the *corpus delicti* rule. This argument is essentially a challenge to the sufficiency of the evidence (*People v. Hurry*, 2013 IL App (3d) 100150-B, ¶ 11), so we review whether, viewing the evidence in the light most favorable to the State, any rational trier of fact

could have found the essential elements of the offense beyond a reasonable doubt (*People v. Gray*, 2017 IL 120958, ¶ 35). The trial court's factual findings are entitled to great deference, but due process requires that the State prove every element of the offense beyond a reasonable doubt. *People v. Lucas*, 231 Ill. 2d 169, 182 (2008). We will reverse a conviction if the evidence was "so unreasonable, improbable, or unsatisfactory" that there is a reasonable doubt of the defendant's guilt. *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 53    For all offenses, the State must prove two propositions: that (1) the crime occurred, *i.e.*, the *corpus delicti*; and (2) the defendant committed the crime. *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). In general, a defendant's out-of-court statement alone cannot establish the *corpus delicti* of an offense. *Id.* Rather, the State must introduce sufficient independent evidence to corroborate the defendant's out-of-court admission to establish the *corpus delicti*. *People v. Willingham*, 89 Ill. 2d 352, 358-59 (1982) ("It is axiomatic that, in order for a conviction based on a confession to be sustained, the confession must be corroborated."). The corroborating evidence need not prove the offense beyond a reasonable doubt, but it must at least tend to establish that the crime occurred. *Sargent*, 239 Ill. 2d at 183-84. Whether there is sufficient evidence to corroborate a defendant's admission is a fact-intensive inquiry that must be decided on a case-by-case basis. *People v. Lara*, 2012 IL 112370, ¶ 26.

¶ 54    To prove defendant guilty of AUUW as charged in Count III, the State had to prove beyond a reasonable doubt that he knowingly carried in any vehicle, when not on his land or in his abode, legal dwelling, or fixed place of business, or on the land of or in the legal dwelling of another person as an invitee with that person's permission, an uncased, loaded, and immediately accessible firearm, and that he had not been issued a currently valid FOID card or CCL. See 720 ILCS 5/ 24-

1.6(a)(1)/(3)(A-5), (C) (West 2016). Defendant only challenges the State's proof that he had not been issued a currently valid FOID card or CCL.

¶ 55 Viewing the evidence in the light most favorable to the State, we find sufficient independent corroborating evidence that tended to establish that defendant had not been issued a valid FOID card or CCL. Defendant's behavior in the BMW suggested that he possessed the firearm illegally, *i.e.*, without a valid FOID card or CCL. When Graal and Gali first saw defendant, they noticed him trying to adjust a bulge on the right side of his waistband, which turned out to be a loaded firearm. Even after defendant's right hand was cuffed, he continued to adjust the firearm with his left hand. A rational factfinder could interpret defendant's behavior as attempting to conceal what he knew to be an illegal firearm. See *People v. White*, 221 Ill. 2d 1, 26 (2006) (the defendant's attempt to conceal an object upon seeing officers "suggested some consciousness of guilt") (abrogated in part on other grounds by *People v. Luedemann*, 221 Ill. 2d 530, 551 (2006)). As explained above, if defendant *had* been issued a valid FOID card or CCL, one would expect him to tell the officers that he had a legal firearm in the vehicle, not try to hide it from them, or to surprise them by drawing it. See *McMichaels*, 2019 IL App (1st) 163053, ¶ 38.

¶ 56 We recognize that the body camera videos do not directly depict defendant's hand movements that the officers testified to. On Graal's body camera video, defendant's right hand is out of frame until Graal cuffs it to the front passenger. When defendant's left hand is visible, it is either on his left knee, on the rear passenger seat, or cuffed to his right hand. On Gali's body camera video, when defendant's hands are visible through the tinted window, they are either on his knees, together in front of his body, or cuffed. The videos, therefore, support an inference that defendant was moving his hands, but they do not show him reaching for or touching his waistband.

However, it is possible that defendant reached for and touched his waistband when his hands were not visible on the body camera videos. The videos do not completely negate this scenario and, viewing the evidence in the light most favorable to the State (see *Gray*, 2017 IL 120958, ¶ 35), we accept it. Thus, we find that defendant's behavior in the BMW was evidence, independent of his statements, that tended to establish that he illegally possessed the firearm.

¶ 57    Defendant argues that "the only evidence introduced by the State regarding the fourth element of the offense, whether [he] lacked a FOID card or CCL, was his alleged statement." That is an overstatement. While defendant's admission at the police station was the only *direct* evidence of whether he had a valid FOID card or CCL, his behavior in the BMW was circumstantial evidence that he possessed the firearm without a valid FOID card or CCL. The State may prove the *corpus delicti* of an offense with circumstantial evidence and inferences, as it did in this case. See *Lara*, 2012 IL 112370, ¶ 33.

¶ 58    *People v. Harris*, 2012 IL App (1st) 100077, which defendant cites, provides little guidance in this case. *Harris* held that an "anonymous eyewitness's hearsay statement to [an officer] was not sufficient to corroborate [defendant's] statement for purposes of proving *corpus delicti*." *Id.* ¶ 21. The case at bar does not involve hearsay statements by anonymous witnesses. Rather, Graal and Gali, both eyewitnesses, testified that they observed defendant moving his hands toward his waistband, where a loaded firearm was found shortly thereafter. The recovery of the firearm, combined with defendant's attempt to conceal it and his statement at the police station, were sufficient to establish the *corpus delicti* of AUUW. Accordingly, we find that the evidence was sufficient to support defendant's conviction.

¶ 59                                        III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm defendant's conviction.

¶ 61    Affirmed.